IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JEFFREY SCOTT HANCOCK,    :
AIS 193290,

                          :

       Petitioner,

                          :

vs.                            CA 07-0076-KD-C

                          :

JOHN F. CUMMINS,

                          :

       Respondent.

## REPORT AND RECOMMENDATION

Jeffrey Scott Hancock, a state prisoner presently in the custody of the respondent, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. This matter has been referred to the undersigned for the entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4). It is recommended that the instant petition be dismissed as time barred under the Anti-Terrorism and Effective Death Penalty Act's one-year limitations provision contained in 28 U.S.C. § 2244(d).

## FINDINGS OF FACT

1.     Hancock was convicted in the Circuit Court of Baldwin County, Alabama on March 16, 1997 of two counts of felony murder and one count of bringing stolen property into the state. (Doc. 10, at 1-2) On April 24, 1997,

petitioner was sentenced to two consecutive life sentences on the murder charges and a consecutive ten-year sentence for bringing stolen property into the state. (*Id.* at 2)

2.      The Alabama Court of Criminal Appeals affirmed Hancock's convictions and sentences in a twenty-eight (28) page memorandum opinion entered on June 18, 1999. (Doc. 8, Exhibit E) In affirming petitioner's convictions and sentences, the appellate court set forth the relevant facts of the case as developed at trial, as follows:

> From October 15, 1995, through October 22, 1995, Hancock, his younger brother, Joey [], and their friend John Roberts engaged in an eight-day, multistate crime spree involving robbery, theft, burglary, and the commission of the murders of Gilman and Susan Smythe. There was testimony indicating that on October 15, 1995, Hancock, Joey, and Roberts were in Biloxi, Mississippi, where they stole a credit card from Joey's girlfriend, Brenda Steder. Steder immediately reported to Bioloxi police that the three men had stolen her credit card. Later that day, Hancock, Joey, and Roberts went with Dixie Cruthirds to a jewelry store in a Biloxi mall, and attempted to charge approximately $4500 in merchandise to the stolen credit card. Cruthrids presented the credit card to the store manager, who ascertained that the card had been stolen. He called mall security, who detained Cruthrids. Hancock, Joey, and Roberts managed to leave the mall without being detained, driving away in Cruthrids's green 1995 Mitsubishi Galant. Cruthrids was arrested and charged with credit card fraud. After her arrest, she told Biloxi police that Hancock, Joey, and Roberts had taken her car without her permission. Arrest warrants, on charges of embezzlement-by-trust, were issued for the three men.

At approximately 5:30 a.m. on the following morning, October 16, Hancock, Joey, and Roberts arrived unannounced at the residence of Diane and Joe McClendon, Hancock and Joey's aunt and uncle, in Rabun (Baldwin County), Alabama. The three men were asleep in Cruthrids's car when Joe McClendon found them parked outside his house. After a brief visit, the three men left the McClendons' house at about 9:00 a.m. on October 16. A short while later, they stopped at a country store in Baldwin County, where, without having obtained prior permission, they charged gas and food items to the McClendons' account with the store. The men then drove to Magnolia Springs in Baldwin County, stopping at about noon, for less than half an hour, for a brief visit with Hancock and Joey's cousin and sister.

Testimony indicated that at around 8:00 p.m. on October 16, the three men arrived at the Dallas, Georgia, residence of Tammy Turner, Hancock and Joey's aunt. The men stayed at Turner's residence for the next two days, leaving at about midday on October 18. On October 20, Turner discovered that a 12-gauge shotgun that belonged to her was missing. She notified police of the theft. At trial, Turner stated that she suspected Joey had taken the shotgun, based on what she said was his "infatuation" with guns and his particular interest in her shotgun. (R.1672.)

At around 5:30 a.m. on October 19, Hancock, Joey, and Roberts, still in Cruthrids's car, arrived in Gulfport, Mississippi, at the home of Rhonda Breaux, where they visited Breaux and her daughter. Later that morning, after Breaux had left for work and her daughter had gone shopping, the three men left Breaux's house. When Breaux returned home later that day, she discovered that her Viper .22 caliber rifle and scope and approximately 500 bullets were missing. Breaux reported the theft to law enforcement officials. At trial, Breaux testified that Joey knew where she kept the rifle because he had helped her move into her house. She stated that Joey was "fascinated" by the rifle and that "he always had a fascination with guns." (R.

938.)

The murder victims, Gilman Smythe and his wife Susan, lived in Magnolia Springs, Alabama. Kim Miller, who rented a trailer on the Smythes' property, located approximately 150 feet from the Smythe's house, testified that at around 6:15 p.m. on October 19, 1995, Gilman Smythe left her trailer, after having repaired Miller's clothes dryer. Dory Price, a longtime friend of the Smythes, testified that she spoke on the telephone with Susan Smythe from 6:40 p.m. to 7:22 p.m. on October 19. Price stated that she left Smythe holding on the phone while she went to the restroom, but when she returned to the phone, she heard only a dial tone. She stated that she immediately redialed the Smythes' phone number, but got no answer.

Raymond Croston testified that sometime before 7:00 p.m. on October 19, he spoke on the telephone with Susan Smythe about some bulldozing work he was to do on the Smythes' property the following day. He arrived at the Smythes' residence sometime between noon and 1:00 p.m. on October 20. Croston testified that when he approached the Smythes' house, he could see Gilman Smythe's body lying in the front doorway, a pool of blood around his head. Croston left immediately and called the police.

Investigators from the Baldwin County sheriff's office were called to the Smythes' residence, where they discovered that both Gilman and Susan Smythe had been shot to death. Gilman Smythe's body lay in the front doorway, where Croston had discovered it. The door would not close, because Smythe's body was in the way. Susan Smythe's body lay inside the house, approximately 10 feet from her husband's body. Forensic testimony indicated that the shootings had occurred sometime during the evening of October 19. Both victims had been shot twice -- once in the mouth, from a distance, and once in the back of the head, with a contact gunshot. Sheriff's investigators found four .22 caliber rifle shell casings near the bodies. Lt. Huey Mack of the Baldwin County sheriff's office was one of the

investigators called to the crime scene. Based on the position of the bodies and the manner in which they had been shot, Lt. Mack stated that it appeared that Gilman Smythe had come to the front door, where he had been shot in the mouth, and had fallen in the open doorway, his prone body preventing the door from closing. At some point in time, a second shot was fired from contact range into the back of Smythe's head. Lt. Mack surmised that Susan Smythe was shot only seconds after her husband fell in the doorway. Like her husband, she was shot once in the mouth and once, from contact range, in the back of the head.

The medical examiner who performed the Smythes' autopsies testified that it was his opinion that Gilman Smythe was shot first in the mouth and then in the back of the head. He stated that the gunshot wounds to the victims' mouths were potentially survivable. However, he said, the close-range shots to the backs of the victims' heads, which tore through their brains, resulted in injuries likely to cause rapid death.

The state presented evidence that the master bedroom in the Smythes' house had been ransacked. Investigators determined that Gilman Smythe's billfold, containing credit cards and cash, had been taken. Also missing were Smythe's .38 caliber revolver and his .25 caliber pistol.

On October 21, 1995, two days after the shooting, Gilman Smythe's billfold and credit cards were found by a motorist who had stopped at a rest area on Interstate 10 near Marianna, Florida. The items were turned over to law enforcement officers. Subsequent fingerprint analysis revealed that Joey's fingerprint was on one of Gilman Smythe's credit cards.

Testimony indicated that on October 21, Hancock, Joey, and Roberts checked into the Flamingo Motel in Magnolia, Arkansas. Hancock signed the motel's registration card, giving his address as Magnolia Springs, Alabama. At around 3:30 a.m.

on October 22, the three men robbed the motel manager at gunpoint. The motel manager reported the robbery to Magnolia police, describing the car they had left in. A BOLO ("be on the lookout") report went out to area law enforcement officers, advising them that three white males in a Mitsubishi Galant had just robbed a motel in Magnolia and were last seen heading east on Highway 82. Shortly thereafter, Matt Means, a police officer in El Dorado, Arkansas, a town 20 to 25 miles down Highway 82 from Magnolia, spotted the Mitsubishi speeding through an El Dorado intersection. Driving the Mitsubishi was Hancock. Means, who had received the BOLO about the suspects, pursued the Mitsubishi in his patrol car, reaching speeds of 100 miles per hour. Hancock[] refused to pull over[] and[,] instead[,] led Means on a high-speed chase. The chase ended when Hancock lost control of the Mitsubishi on a turn in the road, struck a telephone pole, and rolled the car several times, coming to a stop on the front porch of a house. The Mitsubishi then burst into flames. In the crash, Roberts had been thrown from the car, dying instantly. As Means and other police officers approached the wrecked and burning car, Joey shot himself in the head; he died soon after. Hancock survived the crash, having been protected by the driver's airbag. He was pulled from the vehicle and taken to a hospital emergency room.

Investigators verified that the wrecked Mitsubishi was Dixie Cruthirds's. From inside the vehicle, police recovered a sawed-off shotgun; a .22 caliber rifle; a .38 caliber revolver; and a camera bag containing another shotgun, a number of .22 caliber bullets, and a letter in Hancock's handwriting. Also recovered from the vehicle were several duffel bags, full of items of clothing. Found outside the wrecked car were a .25 caliber automatic pistol and the shell casings from some .25 caliber bullets.

The state presented testimony from Richard Carter, a forensic scientist specializing in firearm examination. Carter examined the four .22 caliber bullets recovered from the heads of Gilman and Susan Smythe. All four bullets were badly

damaged by impact; however, Carter was able to determine that one of the bullets recovered from Gilman Smythe had the same rifling characteristics as bullets that were test-fired from the .22 caliber rifle that was found in the Mitsubishi that Hancock had crashed in Arkansas. Carter also testified that the four shell casings investigators found near the Smythes' bodies had been fired from the same .22 caliber rifle found in the Mitsubishi.

Testimony revealed that the .22 caliber rifle police found in the Mitsubishi was the same Viper .22 caliber rifle that was missing from Rhonda Breaux's house after she was visited by Hancock, Joey, and Roberts on the morning of October 19, 1995. Testimony also revealed that the .38 caliber revolver found in the Mitsubishi was the one stolen from Gilman Smythe's house on the evening of October 19. Additional testimony revealed that the sawed-off shotgun found in the Mitsubishi was the one missing from Tammy Turner's house after she was visited by Hancock, Joey, and Roberts. Turner stated that the shotgun's barrel had been sawed off since its theft.

Forensic scientist Deborah Dodd testified that she conducted DNA analysis of a bloodstain discovered on a pair of blue jeans found inside a duffel bag recovered from the Mitsubishi that Hancock had crashed in Arkansas. Dodd compared the bloodstain's genetic structure to the genetic structure of blood samples taken from the bodies of Gilman and Susan Smythe. Dodd determined that the DNA of the bloodstain on the jeans "matched" the DNA of Gilman Smythe. She testified that the probability of randomly finding another person with the same DNA as that of the bloodstain and of Gilman Smythe was 1 in 4,650 among Caucasians and 1 in 3,542,000 among African Americans.

The state presented testimony indicating that the bloodstained blue jeans were the same size -- 30-inch waist/32-inch inseam [--] as other blue jeans belonging to and worn by Hancock. Evidence was introduced showing that the pants Joey

and Roberts were wearing at the time of their deaths were 30/31s and 30/32s, respectively.

Jerry Digman, an investigator with the Arkansas state police, testified that he interviewed Hancock at the hospital approximately six hours after the crash in El Dorado, Arkansas. At that time, Digman questioned Hancock about the crash and about the robbery of the Flamingo Motel in Magnolia. After Hancock was Mirandized, he gave Digman two statements about the robbery. Digman testified that in the first statement, Hancock maintained that he and Roberts had remained outside in the Mitsubishi while Joey had gone inside the motel and robbed the manager. In his second statement, which was given the following day after he was re-Mirandized, Hancock told Digman that all three men had decided together to rob the motel, and he admitted that all three men participated in the robbery, with Joey holding a .25 caliber pistol on the manager.

Danielle Cochran testified that Hancock and Joey had at one time stayed with her and her family for a few months in the trailer located on the Smythes' property in Magnolia Springs, Alabama. Testimony indicated that in August 1995, the Smythes[] ordered the Cochrans to vacate the trailer upon their belief that a member of the Cochran family had stolen several thousand dollars worth of jewelry from the Smythes' house.

The state presented testimony from Winifred Morrisroe, who had worked as a clerk in "Easy D's" convenience store, located approximately three miles from the Smythes' residence in Magnolia Springs. Morrisroe testified that sometime around dark on the evening of October 19, 1995 (the night of the Smythes' murders), a man she identified as Hancock came into the convenience store. Morrisroe stated that Hancock walked around the store nervously, picking up food items and looking out the window. She stated that Handcock left after purchasing some of the items.

(*Id.* at 10-13) Hancock's application for rehearing was overruled on August 6,

8

1999 (Doc. 8, Exhibit G) and his petition for writ of certiorari to the Alabama Supreme Court was denied (*see* Doc. 8, Exhibit I). The certificate of final judgment of affirmance was issued by the Alabama Supreme Court on December 30, 1999. (*See id*.)

3.    On December 6, 2001, Hancock filed a Rule 32 petition in the Circuit Court of Baldwin County, Alabama, collaterally attacking his convictions and sentences. (*See* Doc. 8, Exhibit M, at 1-2) Following an evidentiary hearing, the Rule 32 petition was denied by the trial court on April 5, 2005. (*Id*. at 5) The Alabama Court of Criminal Appeals affirmed the trial court's denial of the collateral petition by memorandum opinion dated January 27, 2006. (Doc. 8, Exhibit M)

> On appeal, Hancock argues (1) that the circuit court erred in determining that no testimony at the Rule 32 evidentiary hearing indicated that perjured testimony had been presented at trial; (2) that his trial counsel was ineffective for not withdrawing from his representation of Hancock at trial and testifying about the alleged perjured testimony given by Danielle Cochran; (3) that his trial counsel was ineffective for not ensuring that his hearing on his motion for a new trial was continued beyond the sixtieth day after sentencing by express agreement of the parties on the record so that he could present affidavits from a witness and from jurors; (4) that his trial counsel was ineffective for not stating specific grounds of objection for the trial court's refusal to give certain jury instructions; and (5) that the circuit court erred in refusing to require the State to produce evidence of the ownership history of two firearms involved in the offenses.

I.

Hancock first argues that the circuit court erred in determining that there was no testimony presented at the evidentiary hearing on Hancock's Rule 32 petition which indicated that Danielle Cochran gave perjured testimony at trial or that trial counsel was aware of the alleged perjury and, further, that his trial counsel was ineffective for not withdrawing as counsel and taking the stand at trial to offer testimony refuting the witness's testimony.

A.

To the extent that Hancock attempts to raise as a substantive issue that the admission of the testimony itself at trial was violative of due process, that claim was not raised in Hancock's Rule 32 petition and is therefore not properly before this Court.

B.

Hancock also argues that one of his attorneys at trial, Frank Hollon, should have withdrawn from representing Hancock at trial so that he could testify that certain testimony given by Danielle Cochran was false.

Hancock never raised this specific contention in his Rule 32 petition or at the evidentiary hearing on his petition. In his petition, Hancock argued specifically that trial counsel was ineffective "when counsel failed to object to the prosecutor's knowledgeable use of perjured testimony during trial." (C.9.) At the evidentiary hearing, the only mention of Hollon testifying was offered by Hollon during his testimony regarding his thought process and his reasons for not questioning Danielle further as to her testimony at trial.

C.

To the extent that Hancock attempts to argue, as he did in his Rule 32 petition, that his trial counsel was ineffective for failing to object to Cochran's testimony, Hollon testified at the evidentiary hearing that he was not aware that Cochran was going to testify differently than what she had represented to him prior to trial. He further stated that

> "When she perjured herself, when she lied right there in the courtroom, and that put me in a position immediately of having been the only person there when I interviewed her, and I was turning into a witness immediately. She sits there and lies. If I had had any idea that she was going to turn like that, we would have had Mr. McCormack or some other person go interview her so I could have attacked her credibility with that other witness. She is on the witness stand, lies right in the middle, and you've got to make a split second decision, you know,  do I immediately scream that's not what you told me in Biloxi and put myself in the position where Mr. Whetstone says that we call Mr. Hollon to the stand to testify, or do I stop the examination immediately and try not to bring any more attention to it and then try to decide to deal with it later in the trial somewhere? That's how we decided to do it. After this trial was over -- and I can't tell you whether she called me or I called her or how we got in touch with each other, but I spoke again with her, and she admitted to me that she lied and that she lied because her mother asked her to do it."

(R. 112-13.) According to Hollon, he then prepared an affidavit which Cochan signed admitting that portions of her testimony at trial had been false. In that affidavit, Cochran stated that she did not believe that Hancock was aware that one of the guns had been stolen, that she had never seen Hancock with any gang

members other than his brother, and that she had told Hollon prior to trial that she had no knowledge that Hancock had any involvement in   gangs, but averred that her step-mother pressured her to testify differently at trial. During a series of questions as to whether Hollon's trial strategy would have been different had he been aware that Cochran or other witnesses were going to implicate Hancock in gang activity, the following exchange occurred:

> "[Hollon]: Maybe so. If all the witnesses we were talking to and his NCIC showed that he had a criminal background and propensity towards violence and a fascination with guns, a fear of being put back in prison, the same motivation that [Hancock's brother who was also involved in the offenses but died during the pursuit by law enforcement which resulted in Hancock's capture] had, we could have had a completely different defense, perhaps. But that's a whole other set of circumstances.

> "[Defense counsel]: But when you went into this trial, you didn't expect any testimony like that to be put in the record?

> "[Hollon]: Did not, no, sir.

> "[Defense Counsel]: So your first opportunity to try to correct that was at the new trial motion?

> "[Hollon]:  That's correct."

(R. 178.)

.     .     .

It is clear from the testimony that Hollon concluded that

12

the best course of action as a matter of trial strategy was to abandon the questioning of Cochran regarding Hancock's alleged gang affiliations so as [to] attempt to limit the damage from that testimony. "Trial counsel should have the broadest discretion in all matters of trial strategy." Having reviewed the record, we cannot say that Hancock has met his burden of pleading or proving that trial counsel was ineffective with regard to this claim.

## II.

Hancock argues that his trial counsel was ineffective for allowing his motion for a new trial to be denied by operation of law by failing to ensure that the record reflected an express agreement by the parties to continue the hearing on the motion to a certain date beyond the sixtieth day after sentencing. Hancock contends that the denial by operation of law resulted in four affidavits which he had intended to introduce into evidence at the hearing on his motion for a new trial being precluded from review. The circuit court denied Hancock relief as to this claim, finding that Hancock had failed to show that the outcome of the proceedings would have been different.

The four affidavits which form the crux of Hancock's assertions as to this issue were as follows: Danielle Cochran's affidavit wherein she admitted to giving false testimony at trial; affidavits from two jurors wherein they averred that they believed that the trial court placed undue emphasis on the jury instructions regarding accomplice liability; and an affidavit from a juror asserting that she was threatened by another juror and that she believed that the trial court placed undue emphasis on the accomplice liability jury instructions.

Initially, we note that Hancock requests that this Court remand the case "for a new hearing on his motion for a new trial." However, we note that the trial court did purport to conduct a hearing on the motion for a new trial, albeit after the motion was deemed denied by operation of law, at which the

trial court, based on the assertions of the parties at the Rule 32 hearing, considered the affidavits and declined to allow them to be admitted into evidence. Hancock has presented no argument, either in his Rule 32 petition, at the evidentiary hearing on his Rule 32 petition, or in his appellate brief, as to why the affidavits would be admissible at a new hearing.

Further, it is well-settled that a new trial will be granted due to recanted testimony only in extraordinary circumstances where there is independent evidence corroborating the testimony that the witness seeks to recant. Here[,] a second witness, Danielle Cochran's step-mother, also testified at trial. Although defense counsel believed her testimony to be false, there is no indication in the record that that witness had also recanted her testimony. Thus, Danielle's recanted statements were corroborated by independent evidence. Further, the testimony was ancillary to the offenses and went to Hancock's character, rather than his culpability for the offenses.

Thus, for these reasons, the circuit court's finding that Hancock had failed to show that the outcome of his proceedings would have been different had the motion for a new trial not been denied by operation of law [was correct]. Therefore, Hancock is not entitled to any relief on this claim.

### III.

Hancock further argues that his trial counsel was ineffective for not moving for a judgment of acquittal on felony murder as a lesser-included offense of capital murder and for not moving for a judgment of acquittal on the charged offense of bringing stolen property into the State.

With regard to the felony-murder convictions, this Court, although noting the lack of a specific challenge to those charges, addressed the merits of Hancock's challenge to those convictions on direct appeal and specifically determined that there was sufficient evidence to sustain the felony-murder

convictions. Thus, Hancock has failed to prove that he was prejudiced by trial counsel's failure to move for a motion for judgment of acquittal as to felony murder.

With regard to the offense of bringing stolen property into the State, contrary to the assertion in Hancock's brief, trial counsel did not admit at the postconviction evidentiary hearing that he had failed to move for a judgment of acquittal on this charge. Rather, the line of questioning on the pages cited in Hancock's brief (R. 52-53) indicates that trial counsel moved for a judgment of acquittal as to the capital-murder charges, but conceded that he did not move for a judgment of acquittal as to any lesser offenses. Taken in the context in which it was given at the evidentiary hearing, it is apparent that defense counsel's remarks were intended to convey that he did not make a motion for a judgment of acquittal as to any lesser-included offenses of capital murder. However, it is apparent from the transcript of the evidentiary hearing and from our memorandum opinion on direct appeal that trial counsel actually made a motion for a judgment of acquittal as to <u>all</u> of the charges in the indictment, which clearly encompassed the bringing-stolen-property-into-the-State charge. "Trial counsel is not ineffective for having an objection overruled or a motion denied."

For these reasons, Hancock is not entitled to any relief on this claim.

IV.

Hancock also argues that his trial counsel was ineffective for not stating specific grounds of objection to the trial court's jury instructions. Although not specifically enumerated in his brief on appeal, we limit our review to requested jury instructions 6, 7, 8, and 14, as those are the instructions Hancock challenged in his Rule 32 petition. (C. 31.)

The circuit court's written order indicates that "Petitioner acknowledged [in the evidentiary hearing] that the failure to

object to Jury Charges 6, 7, 8, and 14 was considered on direct appeal." (C. 7.) In our memorandum opinion on direct appeal, this Court found that, even if a challenge to those requested instructions had been preserved, Hancock would not have been entitled to any relief on that claim because those jury instructions pertained to accomplice liability and were contained in the trial court's oral instructions to the jury regarding accomplice liability substantially covered the same rule of law as the requested charges. Thus, we cannot say that counsel was deficient for not objecting to the trial court's refusal to give the requested instructions and instead instructing the jury pursuant to the pattern jury instructions on the same rule of law. Further, Hancock was not prejudiced by the lack of a specific objection and, therefore, he has failed to prove either prong of the <u>Strickland</u> test to show that he was denied the effective assistance of counsel.

## V.

Finally, Hancock argues that the circuit court erred "in not requiring the State to produce records evidencing the true ownership of handguns offered into evidence at Mr. Hancock's trial."

Initially, we question whether Hancock's brief contains sufficient argument and citation to the record and relevant legal authority to comply with the requirements of Rule 28(a)(10), Ala.R.App.P. In any event, because Hancock's request for discovery involves an attack on the sufficiency of the evidence used by the State for conviction, Hancock's claim is precluded from review because it is a claim that should have been raised at trial or on direct appeal. Accordingly, because Hancock's claim was procedurally barred he cannot establish the "good cause" necessary to entitle him to post-conviction discovery. Therefore, Hancock is entitled to no relief on this claim.

Based on the foregoing, the judgment of the circuit court is affirmed.

16

(*Id*. at 5-13 (internal citations and footnotes omitted)) Petitioner's application for rehearing was overruled on February 24, 2006 (Doc. 8, Exhibit N) and his motion for an extension of time to file a petition for writ of certiorari was denied on March 14, 2006 (Doc. 8, Exhibit O). The certificate of judgment of final order of affirmance was issued by the Alabama Court of Criminal Appeals on April 5, 2006. (Doc. 8, Exhibit P)

    4.    Hancock filed his petition seeking habeas corpus relief in this Court on January 31, 2007. (Doc. 1)

    5.    In response to the respondent's argument in his answer that the instant petition is barred by AEDPA's one-year statute of limitations, Hancock makes the following argument: "[T]his petitioner would concede that if the core of his claims were not jurisdictional and unconstitutional to such a degree that a fundamental miscarriage of justice resulted by his illegal conviction, then the respondent may have a valid argument." (Doc. 10, at 3)

## CONCLUSIONS OF LAW

    1.    The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") was enacted on April 24, 1996 and, pertinent to this case, added a new subdivision to 28 U.S.C. § 2244 providing for a one-year period of limitations within which state prisoners must file their habeas corpus petitions

pursuant to 28 U.S.C. § 2254. *Wilcox v. Florida Dept. of Corrections*, 158

F.3d 1209, 1210 (11th Cir. 1998) *cert. denied sub nom. Wilcox v. Moore*, 531

U.S. 840, 121 S.Ct. 103, 148 L.Ed.2d 62 (2000).

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

2.    Subsections (B), (C), and (D) of § 2244(d)(1) clearly do not

apply to petitioner's case and therefore, the timeliness of Jones' petition must be calculated under § 2244(d)(1)(A) based upon the date on which his first-degree robbery conviction became final.  "For prisoners whose convictions became final prior to the effective date of the AEDPA, the one-year statute of limitations instituted by the AEDPA began to run on its effective date, i.e., April 24, 1996."  *Guenther v. Holt*, 173 F.3d 1328, 1331 (11th Cir. 1999) (citations omitted), *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). This rule from *Guenther* is obviously not applicable in this case since Hancock's convictions became final in 2000.

3.    Section 2244(d)(1)(A) specifically provides that the one-year limitations period will run from "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review[.]" In *Bond v. Moore*, 309 F.3d 770 (2002) and *Jackson v. Secretary for the Department of Corrections,* 292 F.3d 1347 (2002), the Eleventh Circuit joined the majority of circuits regarding the meaning of subsection (A) and held that the statute of limitations period contained in 28 U.S.C. § 2244(d) does not begin to run "until the 90-day window during which Appellant could have petitioned the United States Supreme Court for a writ of certiorari expired." 309 F.3d at 771; *see also id*. at 774 ("Appellant was

entitled to file a petition for a writ of certiorari in the United States Supreme Court within 90 days of the entry of the judgment against him by the Florida Supreme Court. Sup.Ct.R. 13.1. The statute of limitations under 28 U.S.C. § 2244(d) should not have begun to run until this 90-day window had expired. Appellant's state judgment became final on December 13, 1996, when the Florida Supreme Court denied Appellant's motion for a rehearing. The statute of limitations should have begun to run, therefore, on March 13, 1997."); *Jackson, supra*, 292 F.3d at 1348-1349 & 1349 ("While we have not directly dealt with the issue in the context of a section 2254 petition, we indicated in dicta that, under the AEDPA, a state prisoner may have the benefit of the 90-day window before his conviction is considered final. . . . In the instant case, the Fourth District Court of Appeals of Florida [] affirmed Jackson's conviction on October 17, 1997. Giving Jackson the extra 90 days in which he could have filed for *certiorari* to the Supreme Court, Jackson's conviction became final at the latest on January 15, 1998."); *see Locke v. Saffle*, 237 F.3d 1269, 1273 (10th Cir. 2001) ("Under the statute, a petitioner's conviction is not final and the one-year limitation period for filing a federal habeas petition does not begin to run until--following a decision by the state court of last resort--'after the United States Supreme Court has denied review, or, if no

petition for certiorari is filed, after the time for filing a petition for certiorari with the Supreme Court has passed.'"); *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000) ("[T]he one-year statute of limitations does not begin to run until the time for filing a petition for a writ of certiorari for direct review in the United States Supreme Court has expired.  A criminal complaint has only ninety days following the entry of judgment by the 'state court of last resort' in which to file a petition for a writ of certiorari."); *United States v. Torres*, 211 F.3d 836, 839-840 (4th Cir. 2000) ("In § 2244, Congress specifically stated that the one-year limitation period will run from the time that a state judgment becomes final 'by the conclusion of direct review or the expiration of the time for seeking such review.' . . . In using this phrase, Congress offered two dates from which its one-year limitation period can begin running: (1) at the conclusion of direct review or (2) at the expiration of time in which further direct review could have been sought, but was not. Congress, therefore, expressly provided an alternative starting date for its limitation period in the circumstance where a state defendant fails to seek further direct review of his conviction.  The language Congress used, 'by the conclusion of direct review or the expiration of the time for seeking such review,' expands the period of time before the start of the limitation period for

filing a habeas petition beyond the date that marks the conclusion of direct review of that judgment.")[1]; *Bowen v. Roe*, 188 F.3d 1157, 1158-1159 (9th Cir. 1999) ("We hold that the period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the period within which a petitioner can file a petition for a writ of certiorari from the United States Supreme Court, whether or not the petitioner actually files such a petition. Therefore, when a petitioner fails to seek a writ of certiorari from the United States Supreme Court, the AEDPA's one-year limitations period begins to run on the date the ninety-day period defined by Supreme Court Rule 13 expires.").

4.    In this case, on direct appeal, the Alabama Court of Criminal Appeals affirmed Hancock's convictions and sentences by memorandum opinion on June 18, 1999 (Doc. 8, Exhibit E); his application for rehearing was overruled on August 6, 1999 (Doc. 8, Exhibit G) and his petition for certiorari review of his convictions and sentences was denied on December 28, 1999 (Doc. 8, Exhibit I). The Alabama Supreme Court issued a certificate of judgment on December 30, 1999. Adding to December 30, 1999 the 90-day

---

[1]    Beyond this language, *Torres* is of no significance regarding the proper disposition of this case since *Torres* involved a federal prisoner collaterally attacking his conviction and sentence under 28 U.S.C. § 2255 and the Fourth Circuit held that "for purposes of § 2255, the conviction of a federal prisoner whose conviction is affirmed by this Court and who does not file a petition for certiorari becomes final on the date that this Court's mandate issues in his direct appeal."  211 F.3d at 837.

period during which Hancock could have petitioned the Supreme Court of the United States for writ of certiorari, petitioner's convictions became final on March 30, 2000.

5.     In light of the foregoing, Hancock's one-year period of limitations under AEDPA began to run on March 30, 2000 and expired on March 30, 2001. Petitioner did not collaterally attack his convictions and sentences in state court until December 6, 2001, some eight plus months after the one-year period of limitations had expired. Therefore, petitioner cannot take advantage of the tolling period set forth in the statute. *See* 28 U.S.C. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section."); *Guenther, supra*, 173 F.3d at 1331 ("'The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation in [subsection (d)].'").

6.     Accordingly, as even petitioner implicitly concedes (Doc. 10, at 3), the instant federal habeas corpus petition was not timely filed in this

Court. Hancock argues, however, that since his ineffective assistance of counsel claims are jurisdictional, the one-year limitations period does not bar this Court's consideration of his habeas petition. (*See id*.) Petitioner does not cite this Court to any authority, nor can this Court find any, for the proposition that ineffective assistance of counsel claims are jurisdictional claims which toll the running of the limitations period. Moreover, for such a theory to hold water petitioner would need to establish that counsel's ineffectiveness interfered with his ability to file a § 2254 petition within his one-year limitations period, *cf. Beery v. Ault*, 312 F.3d 948, 951 (11th Cir.) ("Ineffective assistance of counsel generally does not warrant equitable tolling. . . . Counsel's false representation that a habeas petition has been filed may warrant equitable tolling."), *cert. denied*, 539 U.S. 933, 123 S.Ct. 2590, 156 L.Ed.2d 615 (2003); *M.P. v. Perlman*, 269 F.Supp.2d 36, 39 (E.D. N.Y. 2003) ("[Petitioner] argues that his failure to seek leave to appeal the affirmance of his conviction to the New York Court of Appeals was due to appellate counsel's failure to obey his directive to file a leave request. Equitable tolling is unwarranted on such grounds, since counsel's alleged ineffectiveness did not interfere with petitioner's timely filing of a habeas application within the one-year period following the finality of his

conviction."); Hancock has not carried his burden in this regard.

7.    Recent decisions of the Eleventh Circuit have clearly embraced the doctrine of equitable tolling with regard to the one-year limitations period at issue:  "Equitable tolling is to be applied when '"extraordinary circumstances" have worked to prevent an otherwise diligent petitioner from timely filing his petition.' . . . Thus, the petitioner must show both extraordinary circumstances and due diligence in order to be entitled to equitable tolling." *Diaz v. Secretary for the Dept. of Corrections*, 362 F.3d 698, 700-701 (11th Cir. 2004) (citation omitted). "Section 2244 is a statute of limitations, not a jurisdictional bar. Therefore, it permits equitable tolling 'when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence.'" *Steed v. Head,* 219 F.3d 1298, 1300 (11th Cir.2000) (citation omitted).  Thus, the one-year limitations provision need not be equitably tolled unless there is evidence that "extraordinary circumstances" beyond petitioner's control made it impossible for him to file his petition on time.  *See Miller v. New Jersey State Dept. of Corrections*, 145 F.3d 616, 618-619 (3rd Cir. 1998) ("[E]quitable tolling is proper only when the 'principles of equity would make [the] rigid application [of a limitation period] unfair.' . . . Generally, this will occur when

the petitioner has 'in some extraordinary way . . . been prevented from asserting his or her rights.' . . . The petitioner must show that he or she 'exercised reasonable diligence in investigating and bringing [the] claims.' . . . Mere excusable neglect is not sufficient."); *Calderon v. United States District Court for the Central District of California*, 128 F.3d 1283, 1288 (9th Cir. 1997) ("Equitable tolling will not be available in most cases, as extensions of time will only be granted if 'extraordinary circumstances' beyond a prisoner's control make it impossible to file a petition on time."), *cert. denied*, 522 U.S. 1099, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998) and *cert. denied sub nom. Beeler v. Calderon*, 523 U.S. 1061, 118 S.Ct. 1389, 140 L.Ed.2d 648 (1998).

8.      Hancock has not established that extraordinary circumstances and due diligence counsel equitable tolling of the limitations period. *See Spottsville v. Terry*, 476 F.3d 1241, 1245 (11th Cir. 2007) ("'The burden of establishing entitlement to this extraordinary remedy plainly rests with the petitioner[.]'"). Tellingly, petitioner makes no argument that he was ignorant of the one-year limitations period or that he was unaware of the fact that this time period had run by the time he collaterally attacked his convictions and sentences in state court on December 6, 2001.  It is apparent to the

undersigned that nothing other than petitioner's own lack of due diligence is responsible for the untimeliness of the filing of the instant petition. This is simply not one of those rare cases in which principles of equitable tolling can save petitioner from AEDPA's one-year limitations period.

9.     Hancock's present federal habeas corpus petition, filed January 31, 2007, almost six years after the one-year limitations period expired, is due to be dismissed as time-barred pursuant to 28 U.S.C. § 2244(d).

## CONCLUSION

The Magistrate Judge recommends that the instant petition be dismissed as time-barred pursuant to 28 U.S.C. § 2244(d).

The attached sheet contains important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this the 31st day of August, 2007.

 s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

27

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

l.      *Objection*.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

　_s/WILLIAM E. CASSADY_____
UNITED STATES MAGISTRATE JUDGE